**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BURTON LOWRY and KATHIE LOWRY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 15 C 4433** |
| | ) | |
| **WELLS FARGO BANK, N.A.,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Burton and Kathie Lowry purchased a home in Antioch, Illinois in July 2004, financing the purchase with a mortgage loan from Defendant Wells Fargo Bank. Burton Lowry lost his job in April 2009, making it difficult for Plaintiffs to maintain their monthly mortgage payments. The Lowrys made multiple calls to the Bank to avoid foreclosure by way of a loan modification or "short sale," but Wells Fargo never gave them a definitive response before the Lowrys defaulted and the Bank initiated foreclosure proceedings in October 2009. The Lowrys vacated their home shortly thereafter, a foreclosure judgment was entered in June 2010, and the property sold at a sheriff's sale two months later. That sale was never confirmed, however, and the Bank vacated the foreclosure judgment without explanation in March 2012. That same month, with the Bank's approval, the Lowrys moved back into their home, where they live to this day.

With the foreclosure vacated, the Lowrys made another attempt to save their home in the summer of 2013. They agreed to resume their mortgage payments—on a trial basis—for the first time since 2009. The Bank assured them that the trial period would lead to a permanent modification with a reduced loan balance. At the close of the trial period, however, the Bank notified Plaintiffs that their loan balance had increased. They declined the Bank's modification offer in October 2013. In the meantime, during the trial payment period, the Lowrys also filed a counterclaim in the Bank's state-court foreclosure action, which was reopened after

the Bank vacated the default judgment in March 2012. The Lowrys raised a claim under the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 515/1 *et seq*. ("ICFA"). Plaintiffs later dismissed the counterclaim and re-filed it, along with two additional state-law claims for fraudulent misrepresentation and fraudulent concealment, as an independent case in this court in May 2015.[1] Defendant moved to dismiss, arguing that Plaintiffs' complaint failed to meet the heightened pleading standard for fraud-based claims under Federal Rule of Civil Procedure 9(b) and that they have also failed to plead an ICFA claim. For the reasons explained below, Defendant's motion [14] is granted in part and denied in part.

## BACKGROUND

The complaint alleges the following facts, presumed to be true for purposes of this motion. The Lowrys bought their house (the "Property") in Antioch, Illinois in 2004 and made regular mortgage payments to Wells Fargo until 2009. (Compl. [1] ¶ 34.) That April, Burton, an electrical engineer by trade, lost his job. (*Id.* ¶ 36.) The Lowrys quickly sought to cut their losses, and listed their home for sale on April 15, 2009. (*Id.* ¶ 37.) By June they had lowered their asking price from $199,000 to $179,000, but still found no buyer. (*Id.*) In the meantime, the family covered their mortgage payments in May, June, and July 2009 by dipping into savings. (*Id.* ¶ 39.) They also temporarily relocated to Utah, where they have family connections and where Burton hoped to find temporary employment. (*Id.* ¶ 38.)

While in Utah, the Lowrys reached out to Wells Fargo to discuss mitigation options. First, Burton called the Bank to cancel automatic debit payments on June 17, 2009. (*Id.* ¶ 40.) During that call, he also asked whether Defendant would accept a short sale on the Property. In response, the Bank's representative asked that Plaintiffs fax a listing agreement and a letter

---

[1] The court has jurisdiction over these state-law claims because the parties are diverse. The Lowrys alleges that the amount in controversy "exceeds $75,000." (Compl. ¶ 3.) They are citizens of Illinois, and Wells Fargo is a citizen of South Dakota. (*Id.* ¶ 2.) The Bank has not challenged the court's subject-matter jurisdiction.

authorizing an agent to assist with a potential short sale, which the Lowrys did.[2]  (*Id*.)  The

Lowrys' second contact with the Bank was a call on July 3, 2009, from Kathie Lowry, requesting

a loan modification.  (*Id*. ¶ 42.)  Apparently in response to the Lowrys' calls, Wells Fargo sent

Plaintiffs a letter—received on July 28, 2009—requesting the family's financial information in

order to "determine the best option available to keep the home."  (*Id*. ¶ 61.)  The letter also

instructed the Lowrys to call 1-800-416-1472.  (*Id*.)  The complaint does not say whether the

Lowrys submitted the requested information or called that number.

On August 17, 2009, Burton again called the Bank.  He spoke to someone in the

liquidation department—the department responsible for short sales—who gave him a list of

documents required before the Bank could authorize a short sale.  (*Id*. ¶ 46.)  Plaintiffs faxed

those materials to Wells Fargo the same day, including a "Borrower Financial Information

Form," listing the Lowrys' household income, expenses, and hardships.  (*Id*. ¶ 47.)  The Lowrys

faxed the Bank a $160,000 short-sale[3] offer from a prospective buyer the next day, August 18,

2009, along with some of the documents necessary for that offer's approval.  (*Id*. ¶ 49.)  They

faxed the remaining documents on August 19.  On August 20, the Lowrys faxed to the Bank

documentation for a second short-sale offer of $137,500 (*Id*. ¶ 51), and then followed up on

September 2, 2009 to alert the Bank that the prospective buyer had increased the offer to

$140,000.  (*Id*. ¶ 56.)  Burton called Defendant on August 20 to discuss the short-sale offers and

spoke with "Brandon" in the liquidation department.  Brandon informed Burton that the Lowrys

were "set up" for a short sale and would be assigned a "negotiator" no later than August 24.  (*Id*.

¶ 52.)  The Lowrys received another letter from the Bank on August 21, 2009, stating that the

Bank had received their "request for assistance" and that the Bank would give them a final

---

[2]    The complaint does not say when the Lowrys faxed these materials.

[3]    The complaint does not say what the mortgage balance was at this point, but
Lowrys owed $158,000 in January 2012.  (Compl. ¶ 83(c).)

decision in 45-60 days. (*Id.* ¶ 53.) It is not clear whether this letter was referring to Plaintiffs' short-sale offers or their request for a loan modification.

The parties next interacted on August 24, 2009. On that day, Burton called the Bank, and "Sandy" in the liquidation department informed him that the Bank had assigned Edward Nornes to be the Lowrys' negotiator. Sandy asked Burton to provide Nornes with several documents, including proof of Plaintiffs' income, which they had already faxed to the Bank one week earlier. (*Id.* ¶ 54.) According to Sandy, Nornes had ordered an appraisal of the property and would be in touch with the Lowrys within two or three weeks after receiving the appraisal. (*Id.* ¶ 55.) Sandy predicted that the process would be complete in approximately thirty days. (*Id.*)

Plaintiffs never heard from Nornes. Nor did the Bank ever respond to either short-sale offer. (*Id.* ¶ 57.) The Lowrys did, however, receive another letter from the Bank on or around September 1, 2009, telling them to call 1-877-255-6505. The writer of this letter is not identified in the complaint, but the letter promised that, if the Lowrys provided the loan number and their income information and made an initial payment calculated based on their circumstances, they would "Get an immediate decision and your new affordable mortgage payment." (*Id.* ¶ 62.) The Lowrys did not call the number because they were waiting to hear from the Bank regarding their short-sale offers, and because they had already provided the requested information weeks earlier. (*Id.* ¶ 63.) Plaintiffs never received an answer regarding either their request for a loan modification or their short-sale offers. (*Id.* ¶ 64.)

On September 21, 2009, the Lowrys met with a bankruptcy attorney in Utah. (*Id.* ¶ 58.) They filed Chapter 7 bankruptcy on October 1, 2009, and received a discharge on January 12, 2010. (*Id.* ¶ 59.) In the interim, Defendant started the foreclosure process against Plaintiffs. In a letter dated October 5, 2009, the Bank advised that the Lowrys' "loan file had been referred to our attorney with instructions to initiate foreclosure proceedings." (*Id.* ¶ 65.) By December 21, 2009, the Lowrys, who were still in Utah, "had given up hope of saving their house." (*Id.* ¶ 68.)

They called the Bank that day to inform Defendant that the property was vacant and the utilities had been shut off.  (*Id.* ¶ 67.)

The Bank filed a state foreclosure action in Waukegan, Illinois, on February 8, 2010, alleging that the Lowrys owed $187,721.60 on their loan.  (*Id.* ¶ 71.)  The Bank's attorneys signed the court documents using "facsimile signatures" (i.e., "the attorney did not personally sign the document with ink pen.").  (*Id.* ¶ 72.)  The Bank's attorneys also drafted affidavits "utilizing assembly-line methods, and lacking personal knowledge of the Lowrys account."  (*Id.* ¶ 73.)  For instance, Plaintiffs point to the affidavit of Anne Neely, the Bank's Vice President of Loan Documentation.  (*Id.*)  Neely's affidavit includes a separate signature page for the notary, "a practice that has since been banned by Illinois Supreme Court Rule 113[4] as indicative of notorial/jurat fraud."  (*Id.* ¶ 74.)  The Nineteenth Judicial Circuit Court in Waukegan, Illinois issued a default judgment in the foreclosure action in June 2010, and the property sold at a sheriff's sale in September of that year.  (*Id.* ¶ 75.)  The complaint does not identify the buyer. Wells Fargo never moved to "confirm" the sale, however, and as a result the Lowrys continued

---

[4]     Rule 113, adopted in February 2013, forbids the use of a separate notary signature page.  The committee notes to Rule 113 explain that

> Paragraph (c) addresses some of the many issues that arise from document handling procedures by lenders and servicers. Illinois courts, along with courts nationwide, have faced issues relating to "robo-signing" practices at major lenders, where affidavits were not properly notarized or where the affiant did not actually review any of the pertinent loan records. In addition to questionable document handling procedures, circuit courts have dealt with prove-up affidavits that come in varied forms, many of which do not properly address the foundational requirements necessary for establishing the accuracy of computerized business records nor the correct amount due and owing under the mortgage and note. Paragraph (c)(2) identifies the minimum requirements necessary for a prove-up affidavit submitted by the mortgagee for entry of a judgment of foreclosure and Form 1 gives a form affidavit that should be used.

> No judgment of foreclosure will be entered without compliance with Paragraph (c). . . .

Ill. Sup. Ct. R. 113(c), Committee Note.

to receive "notices of proceedings," such as a "Notice of Hearing" that reached them in October 2010. (*Id.* ¶ 76.)

Notices continued to arrive in the following months. Confused, Plaintiffs called the Bank's foreclosure counsel, Pierce and Associates ("Pierce"), on April 4, 2011. (*Id.* ¶ 77.) Someone at the law firm told the Lowrys that the property had "gone to sell" and that the firm was "waiting for an affidavit from Wells Fargo." (*Id.*) Later that month, the Lowrys moved back to northern Illinois, where Burton had found a new job. They rented a home for $1200 per month. (*Id.* ¶ 80.) They continued to receive mailings regarding the Property throughout the remainder of 2011, including letters from the Bank regarding taxes and escrow as well as letters from the Pierce law firm, concerning more "court continuances." (*Id.* ¶ 81.) The Lowrys were perplexed by these communications, which "made it appear as if they still owned the house, which they had been told was 'sold.'" (*Id.* ¶ 82.) Matters came to a head when, on January 4, 2012, the Lowrys received a notice from the Bank, asking whether the Property was vacant. (*Id.* ¶ 83.) Not only had Plaintiffs vacated the Property more than two years earlier, but they had advised the Bank at the time and had never suggested they had returned. (*Id.* ¶ 67.) The Lowrys responded by placing several calls to both Defendant and Pierce on January 20, 2012, seeking to clarify who owned the Property. But Bank representatives gave contradictory answers. On the one hand, a woman at Wells Fargo named "Maria" told the Lowrys that she "did not think they could rescind the sale" and a law firm employee, "Page," stated that the Property "went to sale in September 2010," and that although "no final approval was being given, . . . Wells Fargo owns it now." (*Id.* ¶ 83(b), (f).) On the other hand, "Charlene" at Wells Fargo told them that the Property was "still in [the Lowrys'] name." (*Id.* ¶ 83(h).) The Lowrys' final call of the day was to lawyer Nick Blaul at Pierce, who told Plaintiffs that "it is up to Wells Fargo to possibly see if they [the Lowrys] have any options." (*Id.* ¶ 83(m).) Blaul nevertheless promised that he would email a "payoff letter" to Burton, but he never did. (*Id.*)

Three days later, on January 23, 2012, the Lowrys received another notice from the Circuit Court, this one notifying Plaintiffs that a "case management conference" had been continued from December 2011 to December 2012. (*Id.* ¶ 84.)[5] Following up on this notice, Plaintiffs called Defendant's foreclosure counsel again on February 27, 2012. During this call, Burton asked whether the family could "just move back in," and was told that the Lowrys "had every right to do that." (*Id.* ¶ 86.) A Pierce employee also told Burton that Plaintiffs could remain there until thirty days after "all is finalized" with the sale. (*Id.*) Before returning to the Property, Plaintiffs called Wells Fargo on February 28, 2012. Two different Bank employees told the Lowrys that, contrary to the assurances from the Bank's lawyers, Plaintiffs were not permitted to return to their house in Antioch. (*Id.* ¶¶ 90-92.) Burton nevertheless called the Bank again the next day and spoke with Kaylee Kinder in Loan Processing Services. Kinder authorized the Lowry's return to the Property and mailed them the keys to the house via overnight mail. (*Id.* ¶ 93.) The Lowrys moved back in on March 5, 2012. (*Id.* ¶ 94.)

Within days of returning to the Property, the Lowrys received notice that Wells Fargo was moving to vacate the foreclosure judgment. (*Id.*) When Plaintiffs called and asked foreclosure counsel why this was happening, the Lowrys were told "they are vacating because it has taken so long, they would have to start all over on the proceedings." (*Id.* ¶ 95.) Plaintiffs allege that the real motivation for the dismissal was regulatory activity stemming from settlements the Bank had reached with the federal government in 2011 and 2012 related to Wells Fargo's foreclosure servicing activities. (*Id.* ¶ 133.) In any event, the state court vacated the judgment on September 20, 2012. (*Id.* ¶ 95.)

In the months that followed, the Lowrys and Wells Fargo renewed their loan-modification discussions while the Lowrys lived in their home without paying rent or mortgage payments. The Bank sent the Lowrys two "virtually identical" letters, one dated October 20, 2012, the other

---

[5]     The reason for such a lengthy delay is not explained.

dated November 20, 2012, both asking Plaintiffs if they were "[f]inding it difficult to keep up with [their] mortgage payments?" The October letter instructed the Lowrys to "respond by November 19, 2012," and the Lowrys complied, calling Wells Fargo on that date to ask for loan-modification assistance. (*Id.* ¶¶ 99-100.) The Lowrys faxed the Bank 18 pages of "Mortgage Payment Assistance Documentation" and a "Homeowner Assistance Form," which contained information related to their income, expense, and hardship on January 9, 2013. (*Id.* ¶ 102.)

They later received two additional letters, both dated January 9, 2013. One acknowledged receipt of the documents the Lowrys had faxed that day, and represented that the Bank would review the materials to determine whether a loan modification was appropriate. The second letter asked the Lowrys to "call [Defendant] immediately" to provide information that was already included in the Lowrys' January 9, 2013 fax. (*Id.* ¶¶ 103-104.) Plaintiffs allege that these inconsistent letters were computer-generated and neither drafted nor reviewed by a human being. (*Id.* ¶ 106.)

Nine days later, the Bank sent another letter, providing the Lowrys with a "single point of contact" for avoiding foreclosure: Brittainni Hill. (*Id.* ¶ 108.) The Lowrys called Hill on January 23, 2013. (*Id.* ¶ 109.) Hill asked for additional documents during the call. That same day, Wells Fargo sent four different letters to Plaintiffs. Two of the letters stated that Plaintiffs "may be experiencing financial problems that could result in . . . foreclosure," and listed five alternatives: a repayment plan, loan modification, a partial claim, a short sale, and a "deed-in-lieu." (*Id.* ¶¶ 110, 112.) A third letter thanked the Lowrys for sending unidentified documents to the Bank and promised them that the Bank would follow up with more information. This letter also included a reminder that "it's important for you to be making your regular mortgage payments until you hear from us." (*Id.* ¶ 111.) Finally, Wells Fargo sent a fourth letter under the subject line "Additional documentation needed for your request for mortgage assistance." (*Id.* ¶ 115.) This letter stated that the Homeowner Assistance Form the Lowrys had submitted just two weeks prior was no longer used by Defendant. As a result, Plaintiffs would have to

resubmit the information on the new Uniform Borrower Assistance Form. (*Id.*) According to Plaintiffs, the new form allowed for "further automation and lack of meaningful human involvement." (*Id.* ¶ 117.) The four letters mailed to the Lowrys on January 23 were followed by yet another letter, this one dated January 24, 2013. It was from Hill, who wrote to "formally introduce" herself. The letter made no mention of the phone conversation between Hill and the Lowrys just one day earlier, nor did it refer to any of the letters sent the previous day. (*Id.* ¶ 118.) The Lowrys again sent their information to the Bank on February 21, 2013, this time on the Uniform Borrower Assistance Form. (*Id.* ¶ 120.)

Four days later, on February 25, 2013, the Bank sent a request for additional information, and the Lowrys submitted those materials on March 27, 2013. (*Id.* ¶ 121.) The Bank acknowledged receipt in a letter written the next day. (*Id.* ¶ 122.) On May 14, 2013, Hill wrote to inform Plaintiffs that she was "not able to help [them] find a mortgage assistance solution." She went on to say that the "normal collection" process would therefore resume. (*Id.* ¶ 124.) Bizarrely, the Bank sent Plaintiffs another letter that day, this one also signed by Hill, listing alternatives to foreclosure. And the next day, on May 15, 2013, the Bank sent yet another letter, thanking the Lowrys for sending unspecified documentation and reiterating the document request the Bank had initially mailed on January 9, 2013. (*Id.* ¶ 126.) Burton attempted to follow up with Hill via phone on June 13 and June 17, 2014. (*Id.* ¶ 131.) He left voicemails, but never received a return call.

The Plaintiffs' next move was to ask the state court in Waukegan for additional time to respond to the Bank's complaint on June 20, 2013. (*Id.* ¶ 134.) (It is unclear from the complaint what, if anything, had transpired in state court since the foreclosure judgment was vacated in September 2012 or when the complaint at issue had been filed.) Through counsel, the Lowrys filed an answer and a counterclaim under the ICFA on September 4, 2013. (*Id.* ¶ 136.) They later voluntarily dismissed the counterclaim and refiled it as part of the complaint in this case. (*Id.* ¶¶ 137-38.)

In the interim, the parties made yet another attempt at resolving Plaintiffs' debt. On an unspecified date after June 20, 2013, the Bank asked the Lowrys to reapply for a loan modification. (*Id.* ¶ 139.) On May 29, 2014, the Bank offered the Lowrys a Trial Period Plan ("TPP"), which would require Plaintiffs to make three trial payments before receiving a permanent modification of their mortgage. (*Id.* ¶¶ 141, 143.) The Bank assured the Lowrys that any modification would include a reduction in their indebtedness such that they would owe "about the same" amount as when they defaulted (i.e., $187,721.60). (*Id.* ¶¶ 71, 140, 144.) Plaintiffs made three payments pursuant to the TPP on July 1, August 1, and September 1, 2014. (*Id.* ¶ 142.) To their dismay, the permanent modification proposed by the Bank on October 16, 2014 was "far greater than the Lowrys' indebtedness at the time of their default and included all interest accrued." (*Id.* ¶ 145.) Plaintiffs declined the proposed modification. Contrary to the Bank's alleged verbal assurances, the TPP Notice—the document the Lowrys signed in order to participate in the TPP—does disclose that "[a]ny difference between the amount of the trial period payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts as permitted by your loan documents." (*Id.* ¶ 152.) That information appears only in the FAQ section of the document, several pages behind the signature page, but page one of the Notice refers to the FAQ section as one of three attached documents. (*Id.* ¶ 151.)

Plaintiffs filed this action in May 2015. Their 57-page, 329-paragraph complaint [1] contains three counts: a claim under the ICFA, a common-law claim for fraudulent misrepresentation, and another common-law claim for fraudulent concealment. The common-law claims are based on statements the Bank made to Plaintiffs regarding their ownership of the property and their foreclosure alternatives.

<u>**DISCUSSION**</u>

Defendant moves to dismiss [14], arguing that "Plaintiffs fail to meet Rule 9(b)'s heightened pleading standard, dooming both fraud-based counts, and fail to allege an ICFA violation or any actual damages as required by the statute." (Def.'s Mem. [15] at 2.)

**1.    Legal standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. To survive a Rule 12(b)(6) motion, a complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has the right to relief, raising that possibility above a speculative level." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (internal quotation marks omitted). For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

**2.    ICFA**

The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416, 775 N.E.2d 951, 960 (Ill. 2002)). An ICFA claim may be premised on either deceptive or unfair practices. *See Robinson*, 201 Ill. 2d 416, 775 N.E.2d at 960. In either case, the Lowrys must allege that "(1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *Dubey v. Pub. Storage, Inc.*, 395 Ill. App. 3d 342, 353, 918 N.E.2d 265, 277 (1st Dist. 2009) (citing *White v. DaimlerChrysler Corp.*, 368 Ill. App. 3d 278, 283, 856 N.E.2d 542,

546-47 (1st Dist. 2006)). "The actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'" *Su Yeun Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting *Mulligan v. QVC, Inc.,* 382 Ill.App.3d 620, 628, 888 N.E.2d 1190, 1197 (1st Dist. 2008)).

The Lowrys' complaint alleges that Defendant engaged in both unfair and deceptive practices. (Compl. ¶ 303 ("Defendant Wells Fargo, [*sic*] committed unfair and deceptive acts, beginning prior to the Lowrys' loan default, and continuing to this day.").) The complaint follows a peculiar format. In addition to a 152-paragraph recitation of facts, it contains eighteen "specifications," each of which reiterates portions of the facts section. Finally, the complaint's three counts reiterate some or all of the "specifications." According to Plaintiffs, each specification "constitutes a separate and distinct allegation of wrongful conduct." (Compl. at 31 n.5.) The court therefore attempts here to analyze each specification individually.

All eighteen of the specifications are "incorporated and re-allege[d]" in the ICFA count (*id.* ¶ 303), but Plaintiffs do not make any distinction between those acts they claim were "deceptive" versus those that were simply "unfair." As the court reads the complaint however, six of the eighteen specifications appear to allege deceptive or fraudulent activities— Specifications 13 through 18.[6] The first twelve specifications allege unfair treatment, which Plaintiffs claim, "violate[d] public policy, and . . . proximately caused injury in fact to the property of Plaintiffs . . . and damaged the health of Plaintiff Kathie Lowry." (Compl. ¶¶ 313-15.)

Allegations of unfair acts under the ICFA are subject to Rule 8(a)'s general pleading standard, while allegations of deceptive acts "sound[] in fraud" and are therefore subject to Rule 9(b)'s heightened pleading standard. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). Rule 9(b) requires a party alleging

---

[6]    This interpretation is consistent with the fact that Plaintiffs cite only these six specifications to support their fraudulent misrepresentation and fraudulent concealment claims. (*See* Compl. ¶¶ 316-29.)

fraud to "state with particularity the circumstances constituting fraud." Fᴇᴅ. R. Cɪᴠ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted).

### A. Unfair Practice

The court turns first to Plaintiffs' claims of unfairness. To determine whether a practice is unfair, Illinois courts consider three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Robinson*, 201 Ill. 2d at 417-18, 775 N.E.2d at 961 (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)). A practice may be unfair "because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* A practice offends public policy if it violates a standard of conduct contained in an existing statute or common law doctrine that typically applies to such a situation. *Elder v. Coronet Ins. Co.*, 201 Ill. App. 3d 733, 558 N.E.2d 1312, 1316, (1st Dist. 1990); *3525 N. Reta, Inc. v. FDIC*, No. 10 C 3087, 2011 WL 62128, at *6 (N.D. Ill. Jan. 6, 2011). For instance, "a plaintiff may predicate an ICFA unfairness claim on violations of other statutes or regulations . . . that themselves do not allow for private enforcement." *Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 753 (N.D. Ill. 2011).

### i. Specifications 1, 4, 5, 6, and 11: Loan Modification Review

In Specifications 1, 4, 5, 6, and 11, Plaintiffs assert that Defendant violated the ICFA by failing to evaluate their eligibility for a loan modification pursuant to the terms of the Home Affordable Mortgage Program ("HAMP"). (Comp. ¶¶ 153-64, 173-85.) HAMP is "a federal initiative that gives loan servicers incentives to accept lower payments from homeowners at risk of foreclosure." *Calhoun v. Citimortgage, Inc.*, No. 14-1674, 580 F. App'x 484, 485 (7th Cir. 2014). The U.S. Department of the Treasury implemented HAMP to help homeowners avoid foreclosure amidst the sharp decline in the nation's housing market in 2008. *Wigod v. Wells*

*Fargo Bank, N.A.*, 673 F.3d 547, 554 (7th Cir. 2012).  Failure to honestly and effectually implement HAMP guidelines constitutes an unfair business practice under the ICFA.  *Id.* at 574-75.

Supplemental Directive 09-01 of HAMP offers the following guidance:  "All loans that meet the HAMP eligibility criteria and are either deemed to be in imminent default[7] . . . or 60 or more days delinquent must be evaluated using a standardized NPV[8] test that compares the NPV result for a modification to the NPV result for no modification."  U.S. Dep't of the Treasury, Home Affordable Modification Program Supplemental Directive 09-01 (Apr. 6, 2009) (hereinafter "Supplemental Directive 09-01").  This directive requires servicers to conduct NPV tests in certain circumstances, but only after "work[ing] with the borrower to obtain the borrower's financial and hardship information and to determine if the HAMP is appropriate."  *Id.*

Defendant argues that the only failure here was that of Plaintiffs, who never followed up on the September 1, 2009 letter from the Bank.  That letter asked the Lowrys to call and provide information in order to receive a modification.  The Lowrys admit that they received a letter in September 2009, but did not call the Bank because they "were waiting to receive a decision on their pending short-sale offer."  (Compl. ¶ 62-63.)  More importantly, at that point, the Lowrys had already requested a loan modification and had already provided the Bank with the information it sought.  (*Id.* ¶ 63.)  Throughout the relevant time period, the Bank repeatedly issued redundant information requests to the Lowrys.  It cannot fault Plaintiffs for failing to provide materials that they had already supplied.

---

[7]     "A borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, appears potentially eligible for modification, and claims a hardship must be screened for imminent default.  The servicer must make a determination as to whether a payment default is imminent based on the servicer's standards for imminent default and consistent with applicable contractual agreements and accounting standards."  Supplemental Directive 09-01 at 3-4.

[8]     Net present value ("NPV") is "[t]he present value of net cash flow from a project, discounted by the cost of capital."  Black's Law Dictionary (10th ed. 2014).

The Bank also argues that Plaintiffs' ICFA claim fails because it "allege[s] no plausible damages." (Def.'s Mem. at 6.) But, as Plaintiff points out, the Bank's position is inconsistent with Seventh Circuit caselaw. In *Wigod*, the district court dismissed an ICFA claim for, among other things, the failure to allege "actual damages." The Court of Appeals reversed, holding that allegations that the defendant bank's practices prevented Plaintiff from saving her home, "or at least cut[ting] her losses" were sufficient to survive a motion to dismiss. *Wigod*, 674 F.3d at 575 (citing *Boyd*, 787 F. Supp. 2d at 754 (allegations of "damage to [homeowner's] credit" and "the inability 'to fairly negotiate a plan to stay in [his] home'" sufficient to support damages under the ICFA)). Here, Plaintiffs have alleged that Defendant's failure to assess their eligibility for loan modification in 2009 prevented the Lowrys from "avoiding foreclosure" and saving their home. (Compl. ¶ 182.) That is enough to state a claim for damages under the ICFA. *See Wigod*, 674 F.3d at 575.

The Bank raises two additional arguments related to this issue for the first time in its reply brief: (1) Plaintiffs' ICFA claim cannot rely on the Bank's alleged HAMP violations in July 2009 and thereafter because the Lowrys were ineligible for HAMP relief after leaving their home "vacant" in May 2009; and (2) the Bank's alleged failure to consider Plaintiffs for a loan modification could not have caused them to lose their home because by then they "admit they were not interested in 'saving their house.'" (Reply at 5.)

Even if these arguments were not waived by Defendant's failure to timely raise them, *see Amerson v. Farrey*, 492 F.3d 848, 852 (7th Cir. 2007) ("Arguments raised for the first time in a reply brief are waived."), neither holds water. Regarding the Lowrys' HAMP eligibility, the Bank is correct that borrowers are eligible for HAMP relief only if their house is not "vacant." *See* Supplemental Directive 09-01. But the Bank gets the timing here wrong. The Lowrys "temporarily relocated to Utah" in May 2009 (Compl. ¶ 38), but a temporary departure does not render the Property "vacant." *See Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 471 (7th Cir. 1986) ("'[V]acant' means entirely empty (i.e., lack of animate or inanimate objects)").

The Property was not vacant until December 21, 2009, when Plaintiffs "g[ave] up on saving their house." (Compl. ¶¶ 67, 68.) The Bank's assertion that the Lowrys had no interest in keeping their house at the time they sought loan modification is therefore misleading, as the modification attempts (underlying Specifications 1, 4, 5, 6, and 11) all occurred before December 2009. The fact that Plaintiffs had "given up hope" of holding onto their home in December 2009 in no way supports Defendant's contention. To the contrary, the complaint fairly reveals that Plaintiffs were actively seeking foreclosure alternatives through the fall of 2009.

### ii. Specifications 2, 3, and 7: Other Foreclosure Alternatives

Specifications 2, 3, and 7 claim that Defendant acted unfairly by failing to either process Plaintiffs' short-sale offers or tender a deed-in-lieu of foreclosure. In its motion to dismiss, Defendant argues that it was under no obligation to do either of these things. (Mem. at 8-10.) This is particularly true, the Bank contends, because the Lowrys cut these processes short when they filed for bankruptcy just 37 days after Defendant informed them that the short-sale review process would take approximately 30 days. (*Id.* at 8.) In response, Plaintiffs point to Supplemental Directive 09-01, which explains:

> If the NPV result for no modification is greater than [the] NPV result for the modification scenario, the modification result is deemed "negative" and the servicer has the option of performing the modification in its discretion. . . . If a modification is not pursued when the NPV result is 'negative,' the servicer must consider the borrower for other foreclosure prevention options, including alternative modification programs, deeds-in-lieu, and preforeclosure sale programs.

Supplemental Directive 09-01 at 4.

Plaintiffs are correct that this language requires lenders to consider modification alternatives—but the provision makes clear that the requirement is imposed only "[i]f a modification is not pursued when the NPV test is 'negative.'" As noted, the complaint alleges that Defendant never performed the NPV test or otherwise screened Plaintiffs' eligibility for HAMP. Importantly, Plaintiffs do not allege that, had the Bank performed the NPV test, the result would have been negative. Based on the allegations in the complaint, the Bank had no

obligation to consider the Lowrys for other foreclosure prevention options. Specifications 2, 3, and 7 do not state ICFA claims.

### iii.    Specification 9: Failure to Issue Payoff Letter

In Specification 9, Plaintiffs allege that Defendant failed to send a "Payoff Letter" in violation of 735 ILCS 5/15-1505.5, which requires lenders to provide payoff statements to borrowers in foreclosure who request such a letter in writing. The Lowrys admit that they did not submit a written request, but they argue that "Wells waived that [requirement] when its attorneys promised to send the Lowrys a payoff statement." (Pls.' Resp. at 11 (citing Compl. ¶ 84(m)).) But even assuming that the Bank violated 735 ILCS 5/15-1505.5, Specification 9 cannot sustain an ICFA claim, as Plaintiffs have not alleged that the violation caused them any harm.

### iv.    Specification 12: "Ersatz Single Point of Contact"

Specification 12 suffers from the same defect as Specification 9. In it, Plaintiffs complain that Hill, Defendant's supposed "single point of contact" with Plaintiffs, played "virtually no day-to-day role" in the Lowrys' dealings with the Bank. Hill's alleged failure to follow up may have been sloppy, but Plaintiffs do not allege that her actions (or lack thereof) caused them actual pecuniary harm. Furthermore, it is unclear how Hill's actions could have caused pecuniary harm, given that she first became involved in January 2013. At that point, the Lowrys had already declared bankruptcy and Hill apparently played no role in Plaintiffs' TPP. Thus, although communications from Hill were at times contradictory and confusing, an ICFA claim cannot be predicated on her failings as alleged in the complaint.

### v.    Specification 10: Consent Decree and National Mortgage Settlement

Specification 10 alleges that Defendant violated the ICFA by failing to live up to the terms of settlements reached in two other matters involving the Bank: an April 2011 consent decree stemming from a federal interagency review conducted by the Office of the Comptroller

of the Currency[9], and a March 2012 settlement agreement from a suit filed by the Department of Justice and 49 attorneys general against the Bank and other mortgage providers. The latter is widely referred to as the "National Mortgage Settlement."

Defendant argues that Plaintiffs, who were not parties to these agreements, "lack standing to enforce them." (Mem. at 10.) Although that is true, *see Rehbein v. CitiMortgage, Inc.*, 937 F. Supp. 2d 753, 762 (E.D. Va. 2013), Defendant's argument misses the mark. Plaintiffs do not seek to "enforce" the settlements. Instead, they point to Defendant's alleged violation of the terms of those settlements as evidence of the Bank's unfairness as defined by the ICFA. Defendant also points out that it "did not admit any misconduct in either settlement." (Reply at 13.) But this argument is also a canard. Plaintiffs' invocation of the settlements has nothing to do with the wrongdoing alleged in those cases. What Plaintiffs *do* claim is (1) that Defendant's actions in this case run afoul of the terms of the settlements; and (2) that those actions are therefore "unfair" under the ICFA. Although the court is unable to find an ICFA case predicated on these high-profile settlements, the court is nonetheless satisfied that mortgage practices in contravention of their terms "offend public policy" and are "unscrupulous." They are therefore unfair practices within the scope of the ICFA. In fact, the Executive Summary of the National Mortgage Settlement describes the mortgage practices that it proscribes in exactly those terms. *See* Executive Summary of Multistate/Federal Settlement of Foreclosure Misconduct Claims, available at http://www.nationalmortgagesettlement.com/additional-information, last visited September 2, 2016 (describing the banks' foreclosure practices that precipitated the settlement as "misconduct" and "unfair"). The Bank's communications were contradictory and nonresponsive and run afoul of HAMP guidance. Specification 10 states an ICFA claim.

---

[9]     Consent Order, available at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf, last visited September 2, 2016.

### *vi.*     *Specification 8: "Fraudulent[10] Processing of Foreclosure Case"*

Specification 8 alleges that the Bank acted improperly in two ways: (1) the Bank "utilized assembly-line methods and ignored *jurat* requirements in violation of state laws in its processing of Plaintiffs' foreclosure" (Compl. ¶ 197); and (2) the Bank's "Motion to Vacate Judgment constituted an attempt to purge tainted documents from the record and absolve itself of the consequences of filing false and misleading documents." (Compl. ¶ 200.)  The documents in question were "tainted," Plaintiffs allege, because they were "robosigned" or "contain[ed] facsimile (not signed in ink) signatures" and the signatories lacked any personal knowledge of the information contained in the documents they "signed." (*Id.*)

The Bank urges that, even if these actions constituted an unfair practice, Specification 8 falls short of raising an ICFA claim because it fails to allege any damages that resulted.  (Def.'s Mem. at 9.)  "To the contrary," the Bank argues, "the free use of a $185,000 house is the opposite of actual damages." (*Id.* (internal citation omitted).)  Further, the Bank urges, "Plaintiffs abandoned the property months before Wells Fargo instituted foreclosure proceedings and can allege no damages as a result." (*Id.*)

As explained earlier, the Bank's repeated assertion that the Lowrys "abandoned the property months before Wells Fargo instituted foreclosure proceedings" is inaccurate.  The Lowrys allege that they vacated the Property in December 2009.  (Compl. ¶ 67.)  Foreclosure proceedings commenced two months before that.  (*Id.* ¶ 65.)  Furthermore, the Bank ignores the damages explicitly alleged in Specification 8:  "Plaintiffs were damaged by the assembly-line methodology, because the employment of these extra-judicial methods diminished Plaintiffs' opportunity to obtain mortgage relief . . . ." (Compl. ¶ 201.)  The Lowrys claim that the Bank

---

[10]     Although Specification 8 is captioned as the "fraudulent" processing of Plaintiffs' foreclosure, the court reads the allegations therein as describing "unfair" rather than "deceptive" practices for purposes of the ICFA.

employed these methods because it "preferred . . . foreclosure . . . for its own pecuniary gain." (*Id.* ¶ 195.)

Plaintiffs' Specification 8 pleads unfair acts in violation of, among other things, state law, *see* Ill. Sup. Ct. R. 113(c), and the terms laid out in the National Mortgage Settlement, Ex. A. to National Mortgage Settlement ¶ I(A)(1). Furthermore, the Lowrys have adequately alleged damages stemming from these acts, namely that the Bank's violations interfered with the Lowrys' efforts to avoid foreclosure.

Not all of Specification 8 is adequately pleaded, however. The portion of this specification that depends on the Bank's actions in vacating the foreclosure order in 2012 (i.e., Compl. ¶ 200) fails to state a claim. The purported damages in this specification resulted from the Bank's so-called "assembly-line methodology," not the Bank's efforts to cover up their alleged misdeeds. The complaint does not allege any damages that plausibly resulted from the reopening of the foreclosure case.

## B. Deceptive Practice

The court now moves to the complaint's fraud-based claims. To show a deceptive practice under the ICFA, Plaintiffs must demonstrate "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the deception occurred in the course of trade or commerce; and (4) the consumer fraud proximately caused the plaintiff's injury." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008) (internal quotation marks omitted). "[P]roof of intent to deceive" is not required; rather, a plaintiff needs only to allege "that the defendant committed a deceptive . . . act and intended that the plaintiff rely on that act." *Wigod*, 673 F.3d at 575. The ICFA defines deceptive practices as those that involve "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . ." 815 ILCS 505/2.

Specifications 13 through 18 involve deceptive acts.  These allegations "sound[] in fraud" and are therefore subject to Rule 9(b)'s heightened pleading standard.  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust*, 631 F.3d at 446.

### i. Specifications 13 & 16: "Defendant's Misrepresentations Concerning the Foreclosure and Legal Ownership of Plaintiffs' Property" & "Defendant's Misrepresentations Concerning Home Ownership Rights"

In Specification 13, Plaintiffs claim that Defendant made "multiple and repeated misrepresentations concerning the ownership of the property."  (Compl. ¶ 239.)  First, on April 3, 2011, Defendant "falsely told Plaintiffs the property had 'gone to sell.'"  (*Id.* ¶ 240.)  On January 20, 2012, the Bank told the Lowrys that "Wells Fargo owns [the house] now."  (*Id.* ¶ 242.)  But on February 27, 2012, Defendant "conceded that Plaintiffs had 'every right' to occupy the property."  (*Id.* ¶ 243.)  According to Plaintiffs, these "misrepresentations . . . denied [Plaintiffs] the use of their property . . . , while Defendant controlled and possessed the property without benefit of a court order."  (*Id.* ¶ 245.)  Specification 16 is based on related allegations that Defendant told the Lowrys "that Wells Fargo owned the Lowrys' house, that the house was sold, that the Lowrys could not rescind the sale and that the Lowrys had no workout options," all of which Plaintiffs allege were false.  (*Id.* ¶ 278.)  As a result of these statements, the Lowrys allegedly suffered three forms of damage:  (1) they unnecessarily rented a home in the same town as the one they still owned; (2) they "were damaged emotionally and through anxiety and uncertainty"; and (3) they lost "the opportunity to resolve their foreclosure."  (*Id.* ¶ 285.)

The Bank argues that these allegations do not state a claim because the Bank's statements were accurate:  "Informing Plaintiffs the house 'sold' following a Sheriff's sale is not misleading, since a Sheriff's sale is the *only* sale in the foreclosure process."  (Def.'s Reply at 8 (emphasis in original).)  Furthermore, "Plaintiffs neither establish [n]or even suggest a duty on behalf of Wells Fargo's counsel . . . to invite the Lowrys to re-inhabit the Property . . . .  Wells Fargo's foreclosure counsel purportedly told Plaintiffs they *could* move back into the Property,

and they relied on that information to their *benefit*." (Def.'s Mem. at 11-12 (emphases in original).)

The Bank is correct that the Property had "sold" at a sheriff's sale. It is also true that the Bank had no obligation to tell the Plaintiffs that they could remain in the Property, *see Wigod,* 673 F.3d at 572 (discussing lack of fiduciary duty in mortgagor-mortgagee relationship), and Plaintiffs never asked about their right to inhabit the Property until a week before moving back into it. But the Bank could have committed a deceptive act as defined by the ICFA even without violating any fiduciary duty to the Lowrys. *See* 815 ILCS 505/2 (defining "deceptive acts" under the ICFA). More importantly, Defendant ignores two of Plaintiffs' allegations regarding statements made by a Bank official and a Pierce attorney, both on January 20, 2012: the first, made by "Page" at Pierce, asserted that the Bank owned the property; the second, made by "Maria" at Wells Fargo, suggested that the Lowrys could no longer "rescind" the sale. Both of these statements appear to conflict with Illinois law.

First, regarding the Plaintiffs' property rights, "Section 15-1404 of [Illinois's] Foreclosure Law provides that the interests of the borrower are terminated by the judicial sale, 'provided the sale is confirmed.' Thus, it is the confirmation of the sale that ultimately divests the borrower of her property rights." *Wells Fargo Bank, N.A. v. McCluskey*, 376 Ill. Dec. 438, 447, 999 N.E.2d 321, 330 (Ill. 2013) (quoting 735 ILCS 5/15-1404). The sale of the Property in this case, however, was never confirmed. (Compl. ¶ 75 ("Wells Fargo never moved to confirm the Sheriff's sale.")) The Lowrys' property rights therefore remained intact.

Illinois law also grants homeowners a "special right to redeem, for a period ending 30 days after the date the sale is confirmed," so long as the purchaser at the foreclosure sale was a mortgagee and the sale price was less than the sum of the borrower's debts and the mortgagee's costs incurred in the foreclosure process. 735 ILCS 5/15-1603. If these conditions are met, homeowners may save their property by paying the mortgagee the sum described 735 ILCS 5/15-1603. The facts alleged in the complaint suggest that both of these conditions were

met here: the Bank apparently purchased the Property at the sheriff's sale (Compl. ¶ 83(b) (on January 20, 2012, a Pierce lawyer told Plaintiffs that the house sold at a sheriff's sale and "Wells Fargo owns it now"), and the court can assume the purchase price was less than what the Lowrys owed (Compl. ¶¶ 71, 258 (Plaintiffs owed $187,721.60 at the time of default on a property they allege was "worth $138,000"—they do not state the source of this purported value).) As the sale was never confirmed, Plaintiffs maintained a right to redeem at the time they were told otherwise by the Bank.

Plaintiffs have alleged specific deceptive statements, who supposedly made them, and when, where, and how those statements were made. These misrepresentations also caused purported pecuniary damages to the Lowrys (i.e., they continued to unnecessarily rent a home near the Property after the statements were made). These allegations are sufficient to support an ICFA claim, even under the heightened pleading standard of Rule 9(b). The court notes, however, that Plaintiffs' emotional suffering, cited in Specification 16 (Compl. ¶ 285), cannot be the basis of an ICFA claim. *See Kim*, 598 F.3d at 365.

### ii. **Specifications 14 & 18: "Defendant's Misrepresentations Concerning the non-HAMP TPP" & "Failure to Disclose the 'Basic Facts' of the non-HAMP Trial Period Plan"**

Specifications 14 and 18 allege that Defendant made material misrepresentations to the Lowrys regarding their TPP and intentionally "concealed" the TPP's terms from Plaintiffs. (Compl. ¶¶ 246-62, 297-302.) Defendant offered Plaintiffs a TPP via a letter dated May 29, 2014 ("TPP Notice"). (*Id.* ¶ 141.) Prior to receiving the TPP Notice, the Lowrys were assured by the Bank's lawyer (who is not identified by name) that, after completing the TPP, Plaintiffs would receive a permanent loan modification on their mortgage. The lawyer further assured the

Lowrys "that any such plan would include a reduction in the Lowrys' indebtedness."[11] (*Id.* ¶ 140.)  Based on these assurances, the Lowrys agreed to the terms of the TPP and made three payments of $1670.40 between July and September 2014.  (*Id.* ¶ 142.)  At the conclusion of the TPP, Plaintiffs were alarmed to learn that the proposed permanent modification, dated October 16, 2014, resulted in their owing much more "than the Lowrys' indebtedness at the time of their default and included all interest accrued pursuant to the Terms of the Note."  (*Id.* ¶ 145.)  In its foreclosure complaint, the Bank alleged that Defendant's debt totaled $187,721.60 (*id.* ¶ 71), but under the terms of the October 2014 modification, they would have owed $276,693.38 (*id.* ¶ 258).

Plaintiffs acknowledge that the TPP Notice contained an "FAQ" section, which explained that "all of the Lowrys' principal would be capitalized," and that the FAQ section was referred to on the first page of the Notice.  They nevertheless argue that the Bank "hid" this term by placing it several pages after the signature page, rendering the disclosure deceptive and unfair.  (Pls.' Resp. at 12-13.)

Defendant argues that the Lowrys' allegation that the Bank concealed or lied about the key terms of the TPP "is contradicted by the TPP itself.  The information appears, as Plaintiffs allege, on page six of the eight-page document, as part of the 'Frequently Asked Questions.'" (Def.'s Mem. at 12.)  Defendant contends that "Plaintiffs['] sole argument is that this information belonged on the *first three* pages of the document, *not* on page six."  (*Id.* (emphases in

---

[11]     The complaint also alleges that the Bank's attorney "assured the Lowrys that their indebtedness under the permanent modification would be 'about the same' as their indebtedness when they defaulted on their loan."  (Compl. ¶ 144.)  Defendant argues that this allegation is "materially inconsistent" with Plaintiffs' claim that they were told (and believed) that their indebtedness would be reduced by the modification.  (Def.'s Reply at 10 (citing Compl. ¶ 140).)  But these allegations are entirely consistent with one another.  The Lowrys owed approximately $187,000 when they defaulted on their loan.  They owed nearly $90,000 more under the permanent loan modification offer from the Bank in 2014.  Taken together, these allegations indicate that the Lowrys signed the TPP Notice based on the assurance of Defendant's lawyer that they would owe roughly $187,000 under the modification, rather than the $276,693.38 that the modification actually entailed.

original).)  The Bank also urges that Specifications 14 and 18 should be dismissed regardless of whether its actions were "deceptive," because Plaintiffs fail to allege any "damages other than 'anxiety and uncertainty,' which do not satisfy the ICFA."  (*Id.*)

As an initial matter, Defendant's characterization of Plaintiffs' complaint is inaccurate.  The location of the notice is not the Lowrys' "sole argument."  They also claim (1) that the Bank misrepresented the TPP's terms; and (2) that they inquired with the Bank about the mortgage balance prior to signing the TPP, in a manner that informed Defendant "that the Lowrys were entering the [TPP] under a mistake as to its terms."  (Compl. ¶ 299.)  Defendant's contention that the Lowrys only purported damages were "anxiety and uncertainty" is also incorrect.  To the contrary, they allege that "Plaintiffs were damaged by making payments under an illusory arrangement [i.e., the TPP]."  (*Id.* ¶ 302.)

That said, Plaintiffs' allegations in Specifications 14 and 18 do not satisfy the heightened pleading requirements of Rule 9(b).  Neither specification provides 'the who, what, when, where, and how" required for claims sounding in fraud.   For instance, in Specification 14, Plaintiffs claim that "the Lowrys were assured, prior to receiving the Trial Period Plan Notice, that any such plan would include a reduction in the Lowrys' indebtedness."  (Compl. ¶ 140.)  The complaint contains two similar allegations, but none of the three indicate when these purported assurances were made, who allegedly made them, or by what form of communication.  Such vague allegations are insufficient to satisfy Rule 9(b).  Specification 18 fares no better.  In it Plaintiffs allege that "[t]he Lowrys, through counsel, inquired as to the mortgage balance when they were about to enter the TPP.   Defendant knew that the Lowrys were entering the transaction under a mistake as to its terms.  Defendant knew that the Lowrys would reasonably expect disclosure of the method of calculating the mortgage balance."  (Compl. ¶¶ 298-300.)  These vague assertions about the Bank's knowledge are insufficient to state a claim for fraud.  Specifications 14 and 18 are dismissed.

### iii. Specification 15: "Defendant's Misrepresentation Concerning Short Sale"

Specification 15 alleges that, on August 24, 2009, the Bank's employee "Sandy" told Plaintiffs that a "negotiator" named Edward Nornes would contact them within thirty days regarding an appraisal for a potential short sale. (*Id.* ¶ 264.) Plaintiffs never heard from Nornes or anyone else at the Bank regarding their short-sale proposals. (*Id.* ¶ 268.) The Lowrys allege that Sandy knew her comments were false and that she made them in order to induce the Lowrys to forego other loss-mitigation alternatives because the Bank stood to benefit if Plaintiffs defaulted. (*Id.* ¶ 269.) As a result, Plaintiffs claim they "los[t] the opportunity to resolve their foreclosure" via other methods as early as September 1, 2009. (*Id.* ¶ 271.)

Defendant argues that these allegations do not state an ICFA claim for two reasons: (1) Plaintiffs were not actually forced to defer their pursuit of alternative methods because they filed for Chapter 7 bankruptcy just 37 days after the Bank told them the short-sale process would take 30 days; and (2) Plaintiffs' alleged damages (i.e., "deferring action on other loss mitigation alternatives") are "insufficient as a matter of law" because they are not "actual [pecuniary] damages." (Def.'s Reply at 6.)

But Defendant's argument does not address Plaintiffs' allegation that Bank representatives falsely promised them that they would hear from someone within 30 days. Plaintiffs' subsequent bankruptcy filing does not render Defendant's purported misrepresentation less false. Nor does it undercut the allegation that Defendant's statements led the Lowrys to "defer[] acting on other loss mitigation alternatives," including, for example, the possible immediate TPP offered in a September 1, 2009 letter. (Compl. ¶ 270.)

Defendant's second contention is no more persuasive. To support its argument that Plaintiffs' damages are "insufficient as a matter of law," Defendant cites to *Rodriguez v. Chase Home Fin., LLC*, No. 10 C 05876CH, 2011 WL 5076346 (N.D. Ill. Oct. 25, 2011), a 2011 opinion issued by another judge of this court. Rodriguez's complaint was dismissed for failure to plead

"concrete" damages. Rodriguez alleged that, "[h]ad [she] known that her modified monthly payments would have been . . . higher than the 'estimated' TPP payment . . . [she] would have sought any number of other remedies available to her in order to save her home or to otherwise mitigate her losses." *Id.* at *3. This allegation was insufficient to state an ICFA claim, the court held, because "the facts in the complaint only allow the inference that her decision to pursue the modification prevented her from seeking some other unspecified relief. Without knowing what that alleged relief would have been, the complaint does not put Chase or the Court on notice as to how Rodriguez was actually damaged." *Id.*

The Lowrys' complaint is different. Plaintiffs have specified an alternative they deferred: "the September 1, 2009 letter offering to issue an immediate TPP over the phone." (Compl. ¶ 270.) This is enough to put the Bank on notice. Furthermore, the Seventh Circuit has held that similar damages allegations are sufficient at the motion-to-dismiss phase. *See Wigod*, 673 F.3d at 575-76 (holding that allegations that plaintiff could have pursued foreclosure alternatives were sufficient to plead an ICFA violation). Specification 15 states a deceptive practice claim under the ICFA.

### iv. Specification 17: "Defendant's Ambiguous, Misleading Correspondence"

Specification 17 is the final ICFA allegation sounding in fraud. It claims that "Defendant's history of correspondence reveals a methodology of ambiguity, including, but not limited to, statements in three letters dated May 14 and 15, 2013, two letters dated January 9, 2013, and four letters dated January 23, 2013." (*Compl.* ¶ 294.) As a result, Plaintiffs claim, they "were damaged emotionally and through anxiety and uncertainty; by the loss of the opportunity to resolve their foreclosure at that point in time; by increased indebtedness and wrongful damage to their credit." (*Id.* ¶ 295.) The Bank's inconsistent and/or duplicative communications were undoubtedly frustrating and confusing to the Lowrys. But they have not identified a specific statement from these letters that harmed them, nor have they explained how

any of the statements induced them to act in a way that damaged them. The court concludes that this vague allegation is insufficient to state a claim under the heightened standard demanded by Rule 9(b). *See Wigod*, 673 F.3d at 569 ("Under the heightened federal pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff alleging fraud . . . must state with particularity the circumstances constituting fraud. We have summarized the particularity requirement as calling for the first paragraph of any newspaper story: 'the who, what, when, where, and how.'" (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008))).

### 3. Fraudulent misrepresentation and fraudulent concealment

Plaintiffs also raise common-law claims of fraudulent misrepresentation and fraudulent concealment. As their names suggest, these causes of action sound in fraud. They, too, are therefore subject to the heightened pleading standard of Rule 9(b). *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust*, 631 F.3d at 446.

#### A. Fraudulent misrepresentation

The complaint identifies Specifications 13, 14, 15, and 16 as the bases for Plaintiffs' fraudulent misrepresentation claim. The elements of a claim of fraudulent misrepresentation in Illinois are: "(1) [a] false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from that reliance." *Dloogatch v. Brincat*, 396 Ill. App. 3d 842, 847, 920 N.E.2d 1161, 1166 (1st Dist. 2009).

These elements overlap significantly with those required of a deceptive practice claim under the ICFA.[12] The only relevant difference is that in order to also state a claim of fraudulent

---

[12] To state an ICFA claim based on deceptive practices, a plaintiff must allege the following elements: "(1) a deceptive act . . . occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *Dubey*, 395 Ill. App. 3d at 353, 918 N.E.2d at 277.

misrepresentation, one must allege that the defendant made a knowingly false statement, as opposed to a "deceptive act" more generally. Accordingly, the court's fraudulent misrepresentation analysis largely tracks its earlier discussion of these specifications under the ICFA.

Specifications 13, 15, and 16 all adequately pleaded ICFA deceptive practice claims. In each instance, the purported deceptive act was a false statement that the maker allegedly knew to be false. These specifications therefore state claims of fraudulent misrepresentation as well. Specification 14, however, falls short of Rule 9(b)'s heightened pleading standard for the reasons discussed above. It fails to state a fraudulent misrepresentation claim for the same reasons.

### B. Fraudulent concealment

Plaintiffs allege that Specifications 17 and 18 state claims for fraudulent concealment. In addition to meeting the elements of fraudulent misrepresentation, a claim for fraudulent concealment must also allege that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose to the plaintiff. *Weidner v. Karlin*, 402 Ill. App. 3d 1084, 1087, 932 N.E.2d 602, 605 (3d Dist. 2010). A duty to disclose would arise if "plaintiff and defendant are in a fiduciary or confidential relationship" or in a "situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500, 675 N.E.2d 584, 593 (Ill. 1996).

Plaintiffs concede that the Bank was not a fiduciary under Illinois law. (Pls.' Resp. at 15.) Instead, they attempt to proceed under a theory that Plaintiffs placed a "special trust" in Defendant. The complaint alleges that

> [a]s a major lender, Defendant's affiliation with . . . HAMP placed the imprimatur of the United States government on Defendant's loss mitigation services, and foreseeably caused Plaintiffs to place a special trust in Defendant beyond a mere mortgagee-mortgagor or homeowner-mortgage servicer relationship.

(Compl. ¶ 289.)

The plaintiff in *Wigod* made a nearly identical "special trust" argument under similar facts, but the Seventh Circuit rejected it. The plaintiff in that case alleged that Wells Fargo had violated the ICFA by refusing to modify her mortgage pursuant to HAMP guidelines. The district court granted the bank's motion to dismiss, based on the reasoning that HAMP does not create a right of action. The Seventh Circuit reversed. It affirmed, however, the dismissal of the plaintiff's fraudulent concealment claim, which alleged that Wells Fargo "knowingly concealed that it would (1) report her to credit rating agencies as being in default on her mortgage; and (2) reevaluate her eligibility for a permanent modification in contravention of HAMP directives." The district court dismissed this claim due to "the absence of any fiduciary or other duty to speak" on the part of Wells Fargo as a mortgagee." The Court of Appeals agreed with the district court that the plaintiff had failed to state a fraudulent concealment claim, holding that

> Wells Fargo's participation in HAMP is not sufficient to create a special trust relationship with Wigod and the roughly 250,000 other homeowners with whom it entered TPP Agreements. The Illinois Appellate Court has recently stated that the standard for identifying a special trust relationship is "extremely similar to that of a fiduciary relationship."
>
> Accordingly, state and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary one.

*Wigod*, 673 F.3d at 571 (quoting *Benson v. Stafford*, 407 Ill. App. 3d 902, 919, 941 N.E.2d 386, 403 (1st Dist. 2010)). Plaintiffs have failed to state a fraudulent concealment claim in either Specification 17 or 18. Specification 18 is also insufficiently pled under Rule 9(b) for the reasons discussed above.

### 4.    Leave to Amend

Defendant invites the court to dismiss Plaintiffs' complaint with prejudice and deny them leave to re-plead. (Def.'s Reply at 2, 14-15.) The Bank argues that "the doctrine of futility should apply here [because a]fter 57 pages and more than 300 paragraphs, there should be no 'second chance.'" (*Id.* at 14.) The court declines Defendant's invitation.

A court "should freely give leave [to amend pleadings] when justice so requires." FED. R. CIV. P. 15(a)(2). This general rule is no less true after a court has granted a defendant's motion to dismiss. *See also Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008) ("District courts routinely do not terminate a case at the same time that they grant a defendant's motion to dismiss; rather, they generally dismiss the plaintiff's complaint without prejudice and give the plaintiff at least one opportunity to amend her complaint."); *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) (stating that the general rule is that "the district court should grant leave to amend after granting a motion to dismiss"). However, a court should not grant leave to amend where "any amendment would be futile." *See Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011). An amendment is futile if it would not survive a motion to dismiss for failure to state a claim, *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997), or a motion for summary judgment, *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 860 (7th Cir. 2001).

Contrary to the Bank's assertion, an amended complaint would not necessarily be futile here. For instance, Specifications 14 and 18, which currently lack the necessary specificity to satisfy Rule 9(b), might be revived if Plaintiffs can re-plead these allegations, including the "who, what, when, and where" required of claims sounding in fraud. The court will not pre-emptively deny Plaintiffs the opportunity to file an amended complaint that is consistent with the rationale of this opinion. Should Plaintiffs amend their complaint, however, they should heed the guidance of Federal Rule of Civil Procedure 8, which calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." The Lowrys' unconventional use of so-called "specifications," which simply reiterate the facts that were previously enumerated, adds nothing to the complaint but unwieldy volume. This redundancy is disfavored. *See Waivio v. Bd. of Trs. of the Univ. of Ill.*, No. 07-3695, 290 F. App'x 935, 937 (7th Cir. 2008) (describing a "blunderbuss" complaint as one that does not satisfy the "short and plain statement" requirement of Rule 8).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss [14] is granted in part and denied in part. Regarding Count I (ICFA), Defendant's motion is granted as to Specifications 2, 3, 7, 9, 12, 14, 17, and 18. As it relates to the remaining specifications in Count 1, Defendant's motion is denied. Count II (fraudulent misrepresentation) is dismissed only insofar as it relies on the claims raised in Specification 14. Defendant's motion to dismiss Count III (fraudulent concealment) is granted. Any claim dismissed here is dismissed without prejudice to Plaintiffs' later seeking leave to amend within 28 days.

Finally, though several of Plaintiffs' claims may have merit, the court recognizes that their substantial debt to the Bank remains unpaid. Continued litigation is costly. The parties are urged to make a good faith effort to settle their dispute.

ENTER:

Dated: September 2, 2016                     _____
                                             REBECCA R. PALLMEYER
                                             United States District Judge